Ruth GOEBEL; Kathy Edmiston; George Wooten; Lee A. Williams, Jr.; Laura Munson; and All Other Similarly Situated Persons,

and

Jessie Arevalo; Lindsey Griffith; Robert Phares; Bill Pemberton, individually and on behalf of the class of persons herein described, Petitioners,

v.

COLORADO DEPARTMENT OF INSTITUTIONS, and Frank Traylor, M.D., in his official capacity as the Director of the Colorado Department of Institutions; City and County of Denver; Federico Pena, in his official capacity as Chief Executive of the City; Joyce Neville, in her official capacity as Director of the Department of Health and Hospitals; and Edmund Casper, in his official capacity as Director of the Department of Health and Hospitals Mental Health Program, Respondents.

No. 87SC27.

Supreme Court of Colorado,
En Banc.

Nov. 14, 1988.

As Modified on Denial of Rehearing
Dec. 19, 1988.

Legal Aid Soc. of Metropolitan Denver, James W. Dean, Kathleen Mullen, Denver, Colorado Lawyers Committee, Pryor, Carney & Johnson, P.C., Rodney R. Patula, Englewood, for petitioners.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Carolyn Lievers, First Asst. Atty. Gen., Margery T. Bornstein, Sp. Asst. Atty. Gen., Denver, for respondents Colorado Dept. of Institutions, Frank Traylor, M.D., as the Director of the Colorado Dept. of Institutions, Joyce Neville as the Director of the Dept. of Health and Hospitals, and Edmund Casper as the Director of the Dept. of Health and Hospitals Mental Health Program.

Stephen H. Kaplan, City Atty., Morris P. Evans, R.W. Hibbard, III, Asst. City Attys., Denver, for respondents City and County of Denver and Federico Pena as Chief Executive of the City.

Charles Turner, Michael R. Dice, Jon S. Nicholls, Lloyd L. Boyer, Joseph N. de Raismes, Daniel M. Taubman, Denver, for amicus curiae Colorado Bar Ass'n.

LOHR, Justice.

In this class action brought on behalf of certain chronically mentally ill persons residing in northwest Denver, the plaintiffs challenged the adequacy of the mental health care provided to them by the Colorado Department of Institutions and the Denver Department of Health and Hospitals, and sought declaratory and injunctive relief as well as damages. After holding a number of hearings, the trial court dismissed all the claims for relief. The plain-

tiffs then appealed, the defendants cross-appealed, and we granted certiorari prior to judgment by the Colorado Court of Appeals pursuant to C.A.R. 50. We are required to determine whether the certification of the class was proper under C.R.C.P. 23 and, if so, whether the plaintiffs' claims under the Colorado Act for the Care and Treatment of the Mentally Ill, §§ 27–10–101 to –127, 11 C.R.S. (1982 & 1988 Supp.); the Colorado Community Mental Health Services Purchase Act, §§ 27–1–201 to –208, 11 C.R.S. (1982 & 1988 Supp.); the Federal Rehabilitation Act of 1973, 29 U.S.C. § 794 (1982); the Federal Civil Rights Act, 42 U.S.C. § 1983 (1982); the first, fifth, eighth and fourteenth amendments to the United States Constitution; article II, section 25, of the Colorado Constitution; and for breach of the common law duty of clinical care were properly dismissed.[1] We affirm the judgment in part, reverse it in part, and remand this case to the trial court for further proceedings.

## I.

The delivery of public mental health services in Colorado is supervised by the Colorado Department of Institutions through its Division of Mental Health. Mental health services are provided through two state hospitals—the Colorado State Hospital at Pueblo and the Fort Logan Mental Health Center—and a number of community mental health centers throughout the state serving particular geographic areas, called "catchment areas." The City and County of Denver is divided into four catchment areas, each served by a separate mental health center. This litigation focuses on the northwest catchment area, which includes downtown Denver and Capitol Hill and which has a high concentration of chronically mentally ill persons.[2] Many of these persons were released into the community from the Colorado State Hospital and other state institutions during the 1960s and 1970s as part of a nationwide movement toward deinstitutionalization of the mentally ill. At the time this litigation commenced, the community mental health center for the northwest Denver catchment area was the Denver Department of Health and Hospitals (DHH), which had contracted with the state to serve in that capacity.

This case has a long and complex history. During 1980 it became clear that Denver would not be able to continue funding DHH in amounts required to maintain services at existing levels unless the state legislature increased its support. When the necessary support from the state was not forthcoming, Denver conducted a study to assess the situation at DHH and to recommend ways to cut the budget. Recommendations for service reductions were submitted to the mayor in April of 1981. These were accepted and scheduled to take effect on June 1, 1981.

In May 1981, claims were asserted in Denver Probate Court on behalf of the chronically mentally ill persons in northwest Denver by several individuals who had received treatment for mental illness from the Colorado Department of Institutions and who resided in the northwest Denver catchment area. These claims

---

1. The plaintiffs originally also raised claims under the statutes governing county assistance for the poor, §§ 30–17–101 to –108, 12A C.R.S. (1986), and the provisions relating to the licensing of mental health facilities by the Colorado Department of Health, §§ 25–1–101 to –121, 11 C.R.S. (1982 & 1988 Supp.), but withdrew these claims prior to trial. The plaintiffs' claims under the Federal Community Mental Health Centers Act, 42 U.S.C. § 2689 (1980 Supp.); the Omnibus Budget Reconciliation Act of August 1981, Pub.L. No. 97–35 (1981); and the state legislation enabling Colorado to receive federal community mental health funds, see § 27–1–206, 11 C.R.S. (1982), were dismissed by the trial court prior to trial, and the plaintiffs do not contest these dismissals.

2. A "mentally ill person" is now defined in section 27–10–102(7), 11 C.R.S. (1988 Supp.), as "a person with a substantial disorder of the cognitive, volitional, or emotional processes that grossly impairs judgment or capacity to recognize reality or to control behavior...." The psychiatrists testifying at trial agreed that a chronically mentally ill person is someone who suffers from a long standing mental illness that generally is severe and invades many areas of the patient's life. The major categories of chronic mental illness are schizophrenia, manic-depressive illness, and organic brain syndrome.

were brought against the Colorado Department of Institutions and the director of that department.[3] The plaintiffs challenged the adequacy of the mental health care provided to the chronically mentally ill living in the northwest quadrant of Denver, and asserted that the inadequacy of the care available to them violated their rights under a number of federal and state constitutional and statutory provisions. The case was designated *People in the Interest of Goebel*, 81MH270. The plaintiffs moved for class certification and for a temporary restraining order and preliminary injunction to prevent the reduction of mental health services scheduled to take effect on June 1, 1981.

On May 29, 1981, a hearing was held on these motions. The individual plaintiffs requested that they and all others similarly situated be certified as a class under C.R. C.P. 23. They asserted that the state had acted or refused to act on grounds generally applicable to the class, that there were common questions of law and fact, and that the claims of the representative parties were typical of the claims of the class. The plaintiffs estimated that there were between 3,000 and 5,000 chronically mentally ill persons in the northwest Denver catchment area. The motion described the class as

all persons in Colorado presently receiving services, who may receive services during the pendency of this action, or whose aftercare upon discharge from any other mental health facility is the responsibility of Denver Health and Hospitals/Mental Health Program by virtue of any statutory provisions....

The court granted the motion for class certification under C.R.C.P. 23(b)(2) and (b)(3).

At the May 29 hearing, the court also heard evidence on the motion for preliminary injunction. The plaintiffs asserted that the program reductions were likely to increase the time chronically mentally ill individuals would spend hospitalized or in jail and the number of suicides among the chronically mentally ill, causing irreparable harm. The court denied this motion, concluding that the plaintiffs had not sustained their burden of showing irreparable harm, and the reduction in services took place as scheduled on June 1, 1981. A number of mental health programs that closed at that time reopened several months later, although on a smaller scale.

In August 1981, four other persons filed an action in Denver District Court individually and on behalf of the class of chronically mentally ill persons residing in northwest Denver. This action was designated *Arevalo v. City and County of Denver*, No. 81CV6961. As in *Goebel*, the plaintiffs in this case sought declaratory and injunctive relief for violations of the class members' statutory and constitutional rights to receive adequate community-based mental health treatment and services. They also sought damages for each named plaintiff for loss of appropriate care and treatment, physical and mental anguish, as well as deprivation of liberty and violations of other constitutional guarantees. The named defendants consisted of the City and County of Denver, the Denver City Council, the Mayor, the Director of the Department of Health and Hospitals, the Director of the DHH Mental Health Program, the Colorado Department of Health and its director, and the Colorado Department of Institutions and its director.[4] In September 1981

---

**3.** The record does not contain the original or amended pleadings in this matter. From the sketchy references in the materials available to us, we understand that the case had its genesis in four individual mental health cases that were later consolidated. The respondents in those actions successfully sought to restructure the pleadings to posture themselves as plaintiffs and to assert the claims that are involved in the case as now before us. On motion of these persons, the City and County of Denver, the Mayor of Denver, the Denver City Council, the Department of Health and Hospitals and its director,

and the DHH Mental Health Program and its director were joined as defendants. None of the parties contest the appropriateness of the procedures followed, and for present purposes it is not important to understand or detail the intricacies of the initiation of the cases or the amendments of the pleadings. We refer to the persons asserting the claims as the plaintiffs.

**4.** By agreement of the parties, the Colorado Department of Health and its director were later dismissed as named defendants, as was the Denver City Council.

the chief judge of the Denver District Court ordered the *Goebel* and *Arevalo* actions consolidated for hearing and designated the probate judge as an acting district court judge to hear the consolidated cases.

The municipal and state defendants filed motions to dismiss all the claims for relief. The court issued its ruling on these motions on July 7, 1982, *nunc pro tunc* April 14, 1982. The judge reviewed the legal theories upon which the plaintiffs' claims were based and dismissed the claims for relief that were based on:

A. The first and eighth amendments to the United States constitution and its Colorado counterpart; and

B. The Federal Community Mental Health Center Act and the Omnibus Budget Reconciliation Act of August 1981 (as to the request for private rights and institutional reform, including the creation of programs; but not as to the request for declaratory and injunctive relief); and

C. The Federal Rehabilitation Act of 1970 [sic] (as to the request for private rights and institutional reform, including the creation of programs); and

D. § 1983 of the Federal Civil Rights Act.

The cases proceeded to trial before a different judge on the remaining claims. Prior to trial, it was agreed that the initial hearing would focus on the rights of the plaintiff class and that remedies would be addressed in a later proceeding. Fourteen days of trial were held over a three week period during September 1982. The judge then took the cases under advisement and more than two years passed without a decision. During this period, the municipal and state defendants developed a plan to reorganize mental health services in the northwest Denver catchment area.

In August 1984 the Colorado Department of Institutions sent out a request for proposals seeking an organization to replace DHH as the provider of community health care services in northwest Denver. The Department of Institutions accepted the proposal of the Aurora Community Comprehensive Mental Health Center and a number of co-sponsors. DHH's contract with the state to provide community mental health services would be completed as of January 1, 1985, and at that point DHH would withdraw as a community mental health center, and the new organization would take over. However, Denver General Hospital would continue to serve as a long-term and short-term care facility, providing inpatient care. *See* §§ 27–10–105 to –109, 11 C.R.S. (1982 & 1988 Supp.).

In December 1984 the plaintiffs again moved for a temporary restraining order and a preliminary injunction. They requested that the court enjoin implementation of certain aspects of the reorganization plan scheduled to take effect on January 1, 1985, asserting that if the plan took effect there would be a sharp reduction in treatment and support services for the chronically mentally ill, thereby increasing the risk of psychotic episodes, which in turn could result in an increase in hospitalizations, incarcerations on criminal charges, and suicides. The plaintiffs argued that the transition plans and new programs were inadequate and therefore the class of chronically mentally ill would suffer immediate and irreparable injury if the court did not intervene. The court treated the motion as one for preliminary injunction and denied it after three days of hearings, noting that while there was a real possibility that mentally ill persons would be "bruised" in the transition process, it was not persuaded that the new plan would so "drastically and demonstrably" injure the plaintiffs that an injunction was warranted. The reorganization plan went into effect as planned on January 1, 1985.

On May 7, 1985, the court entered its findings of fact, conclusions of law and declaratory judgment. The findings detailed the problems facing the mentally ill trying to live in the community, and reviewed the programs offered by the state and municipal defendants. The court determined that the Act for the Care and Treatment of the Mentally Ill, §§ 27–10–101 to –129, 11 C.R.S. (1982 & 1988 Supp.) (Care and Treatment Act), creates a statu-

tory right to appropriate treatment in the community for patients who have been voluntarily or involuntarily hospitalized, and that the defendants had violated this right by failing to provide an adequate continuum of coordinated community treatment and support services. The court also concluded that the plaintiffs had not established cognizable claims for relief based on section 504 of the Federal Rehabilitation Act of 1973 (29 U.S.C. § 794 (1982)), the common law duty of clinical care, or the United States or Colorado Constitutions. The order stated that lack of funding did not excuse the defendants from fulfilling the plaintiffs' statutory right to care and treatment in the community. The parties filed a number of post-trial motions, including the plaintiffs' motion for a determination of remedies and relief to implement the declaratory judgment, and the state and municipal defendants' motions to alter or amend the findings and judgment. The court's ruling on these post-trial motions made some minor alterations but left the May 7, 1985, order substantially unchanged.

In December 1985 the court issued an order establishing the procedure for determining the appropriate remedies for the violation of the plaintiffs' rights under the Care and Treatment Act. The defendants were ordered to submit a plan for the delivery of appropriate community mental health services. The court also appointed independent experts to evaluate the remedial plan. The state defendants developed a remedial plan as required, but the municipal defendants moved for summary judgment dismissing them from future proceedings, arguing that since DHH was no longer providing community mental health services they no longer were necessary parties. The court heard arguments on this motion and denied it on May 9, 1986.

Before the remedial plan was approved and implemented, the legislature passed Senate Bill 120, which amended the Care and Treatment Act by inserting the language "subject to available appropriations" in various sections of the statute.[5] Senate

---

5. Senate Bill 120 provided in part:

Section 1. The introductory portion to 27–10–101(1) and 27–10–101(2), Colorado Revised Statutes, 1982 Repl. Vol., are amended to read:

27–10–101. Legislative declaration. (1) The general assembly hereby declares that, SUBJECT TO AVAILABLE APPROPRIATIONS, the purposes of this article are:

(2) To carry out these purposes, SUBJECT TO AVAILABLE APPROPRIATIONS, the provisions of this article shall be liberally construed.

Section 2. 27–10–107(6), Colorado Revised Statutes, 1982 Repl. Vol., is amended to read: 27–10–107. Certification for short-term treatment. (6) The respondent for short-term treatment or his attorney may at any time file a written request that the certification for short-term treatment or the treatment be reviewed by the court or that the treatment be on an outpatient basis. If review is requested, the court shall hear the matter within ten days after the request, and the court shall give notice to the respondent and his attorney and the certifying and treating professional person of the time and place thereof. The hearing shall be held in accordance with section 27–10–111. At the conclusion of the hearing, the court may enter or confirm the certification for short-term treatment, discharge the respondent, or enter any other appropriate order, SUBJECT TO AVAILABLE APPROPRIATIONS.

. . . .

Section 4. 27–10–116(1), Colorado Revised Statutes, 1982 Repl. Vol., is amended to read: 27–10–116. Right to treatment. (1)(a) Any person receiving evaluation or treatment under any of the provisions of this article is entitled to medical and psychiatric care and treatment, WITH REGARD TO SERVICES LISTED IN SECTION 27–1–201(1)(a) TO (1)(e) AND SERVICES LISTED IN RULES AND REGULATIONS AUTHORIZED BY SECTION 27–1–202, suited to meet his individual needs, and delivered in such a way as to keep him in the least restrictive environment SUBJECT TO AVAILABLE APPROPRIATIONS. The professional person and the agency or facility providing evaluation, care, or treatment shall keep records detailing all care and treatment received by such person, and such records shall be made available, upon that person's written authorization, to his attorney or his personal physician. Such records shall be permanent records.

(b) Any person receiving evaluation or treatment under any of the provisions of this article is entitled to petition the court pursuant to the provisions of section 13–45–102, C.R.S., SUBJECT TO AVAILABLE APPROPRIATIONS, for release to a less restrictive setting within or without a treating facility or release from a treating facility when adequate medical and psychiatric care and treatment is not administered.

Bill 120 was signed by the Governor and became effective on May 3, 1986. Ch. 210, 1986 Colo.Sess.Laws 1010–11. The state defendants then asserted that under the amended act, the court no longer had jurisdiction to implement the remedial plan, and they moved to dismiss the plaintiffs' claims for injunctive relief. The municipal defendants supported that position. On June 11, 1986, the court heard oral arguments on its jurisdiction to require a remedial plan, and it issued an order on July 11, 1986, stating that it no longer had jurisdiction to order injunctive relief. The court urged the state and municipal defendants to implement the remedial plan voluntarily and ordered the defendants to furnish semi-annual reports outlining the steps taken toward implementation of the plan.

The court entered final judgment pursuant to C.R.C.P. 54(b) on October 10, 1986, dismissing with prejudice all of the plaintiffs' claims except those for damages incurred for violation of the Care and Treatment Act prior to the passage of Senate Bill 120.[6] In an order issued on December 4, 1986, the court supplemented its final judgment, stating that the Care and Treatment Act "provides neither an express nor an implied cause of action for damages" and dismissing the damage claims. The plaintiffs appealed from the final judgment, and the state and municipal defendants cross-appealed. While the case was pending in the court of appeals, the plaintiffs petitioned this court for expedited review pursuant to C.A.R. 50 or for extraordinary relief under C.A.R. 21. We granted expedited certiorari under C.A.R. 50.

## II.

In addressing the issues raised by the parties, we will first consider the municipal defendants' challenge to the class certification on the grounds that the class should have included only involuntarily hospital-

ized patients.[7] Second, we will examine the claims arising under the Care and Treatment Act. The plaintiffs assert that the trial court correctly interpreted the act in its May 7, 1985, order, and that Senate Bill 120 did not deprive the court of jurisdiction, while the defendants disagree with both these propositions. Third, we will address the plaintiffs' assertion that the trial court improperly dismissed the claim arising under the Colorado Community Mental Health Services Purchase Act. Fourth, we will consider the plaintiffs' argument that section 504 of the Federal Rehabilitation Act provides them with claims for the creation of new programs and for damages to remedy past discrimination. Fifth, we will examine the plaintiffs' assertion that the municipal defendants violated their common law duty of clinical care, and the municipal defendants' contention that there is no such duty. Finally, we will consider the plaintiffs' statutory and constitutional claims arising under 42 U.S.C. § 1983 and the Colorado Constitution.

### A. CLASS CERTIFICATION

Before we examine the substantive issues, we must first determine whether the plaintiffs were properly certified as a class under C.R.C.P. 23, which governs the certification and maintenance of class actions. The prerequisites to certification of a class are described in section 23(a):

One or more members of a class may sue or be sued as representative parties on behalf of all only if: (1) The class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Ch. 210, sec. 1, 2, 4, §§ 27–10–101, –107, –116, 1986 Colo.Sess.Laws 1010, 1010–11.

6. The trial court incorporated its May 7, 1985, declaratory judgment into the final judgment issued on October 10, 1986.

7. The state defendants also argue that any right under the Care and Treatment Act to care and treatment after discharge from hospitalization applies only to involuntarily hospitalized patients, but they do not cast this argument in the form of a challenge to the class certification. *See infra* § IIB(1).

In ruling on the *Goebel* plaintiffs' motion for certification of the class, the trial court considered these requirements and determined that they were satisfied. In order for an action to be maintained as a class action, it must also satisfy the requirements for one of the general types of class actions described in section 23(b). The trial court determined that this case met the criteria of sections 23(b)(2) and 23(b)(3).[8] In its May 7, 1985, ruling the court made clear that the *Goebel* class certification was broad enough to encompass the named plaintiffs in *Arevalo*[9] and described the class as follows:

> All persons residing in the Northwest Catchment Area of the City and County of Denver, Colorado, of whom Denver Health and Hospitals/Mental Health Center knows (or reasonably should be aware) who during the pendency of this action: (1) receive mental health services; or (2) whose mental health care aftercare upon discharge from any other mental health facility is the statutory responsibility of Denver Health and Hospitals/Mental Health Center.

> This class excludes those chronically mentally ill persons within that catchment area of whose status as chronically mentally ill it would be unreasonable to expect Denver Health and Hospitals/Mental Health Center to be aware in the exercise of its functions, except until such time during the pendency of this action as Denver Health and Hospitals/Mental Health Center is made aware

of any such individual residing within its catchment area.

■ The municipal defendants' challenge to the class certification is based on the contention that the class should not include persons who received hospitalization on a voluntary basis, since the Care and Treatment Act does not provide them with the right to treatment in the least restrictive environment. Although we reject the assertion that the Care and Treatment Act in this respect applies only to involuntarily hospitalized patients, *see infra* § IIB, we conclude that the trial court abused its discretion in certifying the plaintiff class as the class appropriate with respect to each of the claims asserted. In its July 7, 1982, ruling, the court recognized that "[t]he plaintiffs, despite their being lumped in a single class, are in fact in different positions within the mental health system," and described the different categories within the plaintiff class:

> [T]here are two relatively clear, distinct categories of plaintiffs, and several subcategories whose status is not nearly so clear. The first category of plaintiffs includes those ... who are or have been in-patients under involuntary certification, and who would benefit from community treatment. That is the class of defendants [sic] whose rights to treatment are most clearly protected by the statute and the constitutional provisions.

> Another class of plaintiffs are those who are non-institutionalized, and not certified. Those plaintiffs are less clear-

---

**8.** C.R.C.P. 23(b) provides in relevant part:

Any action may be maintained as a class action if the prerequisites of section (a) are satisfied, and in addition:

....

(2) The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or (3) The court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:

(A) The interest of members of the class in individually controlling the prosecution or defense of separate actions;
(B) The extent and nature of any litigation concerning the controversy already commenced by or against members of the class;
(C) The desirability or undesirability of concentrating the litigation of the claims in the particular forum;
(D) The difficulties likely to be encountered in the management of class action.

**9.** Although *Arevalo* was purportedly brought as a class action, the court had never previously determined by order that it could be so maintained. *See* C.R.C.P. 23(c)(1).

ly entitled to either constitutional or statutory rights to treatment.

The court sees that there are at least two in-between kinds of categories....

The first sub class includes the allegedly illusory voluntary in-patients. Those would be those mentally ill patients who are in fact involuntary patients, although nominally on the books of the institution responsible for treatment, they are characterized as voluntary patients because of circumstances under which they or someone on their behalf signed in....

The second in-between category is composed of those chronically mentally ill patients who were previously certified, and who are presently legally certificable [sic] but who are not certified in fact, and are living in the community, and who would take advantage of the community programs if they were available.

In its May 7, 1985, ruling, the trial court also recognized that the class members eligible for relief under the Care and Treatment Act[10] differ from those asserting a constitutional right.[11] However, the court did not go far enough in defining how the categories of plaintiffs were related to each claim for relief, relying instead on its certification of one broad plaintiff class. Given the extent of the class and the wide range of issues presented in this case, the court should have more carefully delineated the nature of each claim for relief and the categories of plaintiffs who could ask for such relief.

Trial courts have a great deal of discretion in determining whether to certify a class action. *Friends of Chamber Music v. City and County of Denver*, 696 P.2d 309, 316–17 (Colo.1985). C.R.C.P. 23 allows the trial court flexibility in shaping a class action. It provides the court with "ample powers, both in the conduct of the trial and relief granted to treat common things in common and to distinguish the distinguishable."[12] *Jenkins v. United Gas Corp.*, 400 F.2d 28, 35 (5th Cir.1968). Subsection 23(c)(4) provides that when appropriate:

(A) An action may be brought or maintained as a class action with respect to particular issues, or (B) a class may be divided into subclasses and each subclass treated as a class, and the provisions of this Rule shall then be construed and applied accordingly.

This subsection is particularly helpful in enabling courts to restructure complex cases to meet the requirements of. Rule 23. *See* 7B C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1790 (1986). A court may utilize its powers under 23(c)(4) on a motion by the parties or on its own initiative. *See Marcello v. Regan*, 574 F.Supp. 586, 591–92 (D.R.I.1983). In fact, in some cases it may be an abuse of discretion if the trial court does not initiate action under 23(c)(4) to structure the class action. *See Johnson v. Uncle Ben's, Inc.*, 628 F.2d 419, 423 (5th Cir.1980), *cert. de-*

---

**10.** The court initially described the class members with rights under the Care and Treatment Act as follows:

1. Those who have been inpatients under involuntary certification, and still are certified; and
2. Those who have been inpatients on a voluntary basis; and,
3. Those who at one time were certified but presently are not certified in fact, although presently are legally certifiable.

The court's May 7, 1985, order, however is not entirely consistent in describing the categories of plaintiffs who are granted rights under that act. We conclude that only those persons who have received evaluation or treatment under any of the provisions of the Care and Treatment Act are within the class that has rights under that act. *See* § 27–10–116(1)(a), 11 C.R.S. (1982).

**11.** The court noted that any constitutional right to treatment would be limited to:

1. Those who were released into the community from the state hospitals as part of the deinstitutionalization movement, and now reside in the Northwest Catchment Area;
2. Those discharged into the Northwest Catchment Area from in-patient hospitalization in the Department of Health and Hospitals; and
3. Those presently confined in mental health facilities under the aegis of the Denver Department of Health and Hospitals who are capable of being treated in the community.

**12.** C.R.C.P. 23 is virtually identical to Fed.R.Civ. P. 23, and therefore, in interpreting the Colorado rule we rely on cases applying the federal rule.

*nied* 459 U.S. 967, 103 S.Ct. 293, 74 L.Ed.2d 277 (1982).

C.R.C.P. 23(c)(4) authorizes a trial court to isolate the issues appropriate for representative treatment, *see Rice v. City of Philadelphia,* 66 F.R.D. 17, 20 (E.D.Pa. 1974); *Goldstein v. Regal Crest, Inc.,* 59 F.R.D. 396, 400 (E.D.Pa.1973), or to subdivide a class into suitable categories, such as groups seeking relief under different statutes, *see Marcello v. Regan,* 574 F.Supp. at 591–92; *Wolfson v. Solomon,* 54 F.R.D. 584, 588 (S.D.N.Y.1972). By carefully delineating the class or subclass with respect to each issue, the advantages of adjudicating issues that are common to the entire class or subclass on a representative basis may be secured even though other issues in the case may have to be litigated separately by each class member. *Fogel v. Wolfgang,* 47 F.R.D. 213, 217 (S.D. N.Y.1969).

The court should have used its powers under C.R.C.P. 23(c)(4) to control and shape this action. Therefore, on remand, the trial court must more carefully assess whether each claim for relief remaining in the case is appropriate for adjudication in a class action and, if so, what categories of persons should make up such a class or subclass.

█ The trial court also failed to address whether the plaintiffs' claims for damages are appropriate for treatment in a class action, and if they are, whether notice to individual class members is required. The plaintiffs' class action claims for relief included claims for damages under Section 504 of the Federal Rehabilitation Act, 42 U.S.C. § 1983, and the common law duty of clinical care. In granting the motion for class certification, the court relied on both C.R.C.P. 23(b)(2) and 23(b)(3). Notice to members of the class is required in an action maintained under 23(b)(3) but not in one maintained under 23(b)(2).

Generally, courts have determined that 23(b)(2) is applicable where the relief sought is predominantly injunctive or declaratory, and does not apply where the primary claim is for damages. *See* 3B J. Moore & J. Kennedy, *Moore's Federal Practice* ¶ 23.45[1] (1987). If the primary claim is for injunctive or declaratory relief and damages are also requested, the case can proceed as a 23(b)(2) action without notice to class members if the damages claim can be characterized as incidental in nature. *See, e.g., Probe v. State Teachers' Retirement System,* 780 F.2d 776, 780 (9th Cir.1986), *cert. denied* 476 U.S. 1170, 106 S.Ct. 2891, 90 L.Ed.2d 978 (1986); *Parker v. Local Union No. 1466, United Steelworkers of America,* 642 F.2d 104, 107 (5th Cir.1981). If the damage remedy sought in any class action claim in this case is primary rather than incidental, the claim would fall under 23(b)(3) and the notice requirements of 23(c)(2) would apply. This would require the court to "direct to the members of the class the best notice practicable under the circumstances." This notice would have to inform each class member that, among other things, he or she has the option to be excluded from the class and that if a member does not exercise that option any judgment later entered in the class action will be binding on that member. On remand, the trial court must consider how the plaintiffs' damages claims that were not properly dismissed should be characterized and must also address the issue of notice.

### B. CARE AND TREATMENT ACT

The trial court initially ruled that the Care and Treatment Act created broad rights for members of the plaintiff class "to receive comprehensive care and treatment while known to be residing in the Northwest Catchment Area," and that both the municipal and state defendants were obligated to satisfy this right to care. After the general assembly adopted Senate Bill 120, however, the court determined that this ruling was no longer accurate since the right to care and treatment had been legislatively conditioned on the availability of funds. The court concluded that the funding limitation deprived it of jurisdiction to enter an injunction requiring the implementation of any plan to provide care and treatment to the plaintiff class through community mental health centers. The

plaintiffs challenge the court's conclusion that Senate Bill 120 had this effect, and the municipal and state defendants challenge the court's original interpretation of the Care and Treatment Act as it existed prior to the enactment of Senate Bill 120. We first address the question of whether any legally enforceable rights to care and treatment were created by the Care and Treatment Act and then consider the effect of Senate Bill 120 on any such rights.

### 1.

The Care and Treatment Act was enacted in substantially its present form in 1973 and provides comprehensively for the commitment, care and treatment of persons who are mentally ill and, as a result of mental illness, a danger to others or to themselves or gravely disabled. The act encompasses both voluntary and involuntary treatment, to be administered in designated hospitals and other mental health facilities. The statutory scheme contemplates an initial seventy-two hour treatment and evaluation followed by further care on a voluntary basis or by certification for not more than three months of short-term treatment in the absence of the patient's consent. §§ 27–10–103 to –108, 11 C.R.S. (1982 & 1988 Supp.). When further treatment is required, the patient may be certified for long-term treatment for successive periods of six months. § 27–10–109, 11 C.R.S. (1982 & 1988 Supp.). Provisions are made for periodic review of the appropriateness of continued certification and for judicial determination that the criteria for continued involuntary treatment have been met. § 27–10–111, 11 C.R.S. (1982 & 1988 Supp.).

The plaintiffs contend that the Care and Treatment Act provides a right to appropriate care and treatment for the chronically mentally ill, both while hospitalized for treatment and while living in the community after discharge. At the time they commenced these actions, section 27–10–116(1)(a), 11 C.R.S. (1982), provided in pertinent part:

Any person receiving evaluation or treatment under any of the provisions of this article is entitled to medical and psychiatric care and treatment suited to meet his individual needs and delivered in such a way as to keep him in the least restrictive environment possible.

The trial court determined that, pursuant to this act, "known diagnosed chronically mentally ill persons have a statutory right to care and treatment in the community." The court concluded that this right applied to both those who have been inpatients under involuntary certification and those who have been inpatients on a voluntary basis.

The state and municipal defendants do not challenge this conclusion as it applies to involuntary patients, but they argue that the trial court erred in holding that this right applies as well to voluntary patients. They contend that the Care and Treatment Act distinguishes between voluntary and involuntary patients and that the right set forth in section 27–10–116(1)(a) applies only to those involuntarily hospitalized. The municipal defendants emphasize that this court has referred to the Care and Treatment Act as a commitment statute providing a method to hospitalize involuntarily those who are a danger to themselves or others, see, e.g., People v. Taylor, 618 P.2d 1127 (Colo.1980), and argue that only those patients involuntarily committed have a continuing right to treatment after discharge from a treatment facility. However, as the trial court noted, in section 27–10–101, 11 C.R.S. (1982 & 1988 Supp.), the legislature described the purposes of the Care and Treatment Act as extending comprehensively to address the needs of all mentally ill persons as follows:

(a) To secure for each person who may be mentally ill such care and treatment as will be suited to the needs of the person and to insure that such care and treatment are skillfully and humanely administered with full respect for the person's dignity and personal integrity;

(b) To deprive a person of his liberty for purposes of treatment or care only when less restrictive alternatives are unavailable and only when his safety or the safety of others is endangered;

(c) To provide the fullest possible measure of privacy, dignity, and other rights to persons undergoing care and treatment for mental illness;

(d) To encourage the use of voluntary rather than coercive measures to secure treatment and care for mental illness....

(2) To carry out these purposes, the provisions of this article shall be liberally construed.

In addition, section 27–10–116(1)(a) expressly states that *"[a]ny* person receiving evaluation or treatment under *any* of the provisions of this article" (emphasis added) has a right to medical and psychiatric care and treatment.

Our primary task in construing a statute is to ascertain and give effect to the intent of the legislature. *People v. District Court,* 713 P.2d 918, 921 (Colo.1986). To discern legislative intent, we must look to the language of the statute, and words and phrases must be given effect according to their plain and ordinary meaning. *Id.; Trinity Universal Insurance Co. v. Hall,* 690 P.2d 227, 230 (Colo.1984). We conclude that the trial court's reading of the Care and Treatment Act as providing rights to both voluntary and involuntary patients is fully consistent with the language of the act and the legislative intent expressed in section 27–10–101. *Cf. Halderman v. Pennhurst State School and Hospital,* 612 F.2d 84, 100–03 (3d Cir.1979) (construing Pennsylvania's Mental Health and Mental Retardation Act of 1966 to create an obligation to provide services to mentally handicapped in the community on the basis of need), *rev'd on other grounds,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981); *Dixon v. Weinberger,* 405 F.Supp. 974, 979 (D.D.C.1975) (construing the 1964 Hospitalization of the Mentally Ill Act to require placement in alternative facilities in the community that are less restrictive than an inpatient facility when such placement is consistent with the rehabilitative purposes of the act).

■ The trial court, having found a statutory right to treatment, concluded that the defendants had violated that right by "fail[ing] to provide the required broad con-tinuum of coordinated community treatment and support services." The defendants challenge this part of the trial court's findings. The state defendants argue that the class is bound by the evidence presented in regard to the class representatives, and the state contends that this evidence establishes that the named plaintiffs did receive treatment based on their individual needs in the least restrictive setting. We reject the state's argument. The state defendants refer to no authorities that support their argument, which seems to be based on the premise that the treatment accorded the named plaintiffs must also have been available to the other class members. While it is true that the named plaintiffs were transferred to less restrictive placements during the course of this action, the evidence presented at trial established that many class members were not similarly treated. The testimony revealed that many chronically mentally ill individuals in the northwest Denver catchment area live in boarding houses or nursing homes that lack adequate support and treatment services and therefore do not provide a desirable therapeutic environment. The record shows that only small numbers of mentally ill persons are served by programs such as day care, outreach, and vocational rehabilitation, while many others could benefit from such services. We conclude that the evidence amply supports the trial court's finding that the defendants failed to satisfy their obligation to provide the plaintiff class with adequate care and treatment in the community.

■ In its May 7, 1985, ruling, the trial court also determined that lack of funding did not excuse the defendants from fulfilling the rights of the chronically mentally ill under the Care and Treatment Act. In a later ruling, the court added that the Care and Treatment Act created an entitlement to continuing treatment and that "nowhere in [the Care and Treatment Act] did the Legislature equate that entitlement to the funds available from time to time for the purpose." The court stated "if the Legislature intended the rights granted under the Colorado Care and Treatment of the Men-

tally Ill Act to expand and contract in response to its annual fiscal infusions, the Legislature ought to make that intention crystal clear...."

We conclude that the trial court prematurely and unnecessarily addressed the issue of whether persons afflicted with chronic mental illness have rights created by the Care and Treatment Act that must be satisfied without regard to the amount of money appropriated by the legislature for that purpose. The legislature chose to create such rights by the use of strong language of entitlement in section 27–10–116(1)(a) and in the statement of the purposes of the Care and Treatment Act in section 27–10–101. This language reflects a firm commitment and resolve on the part of the General Assembly that adequate care and treatment will be provided to those mentally ill persons who receive services under the Care and Treatment Act in order to keep them in the least restrictive environment possible. However, the amount of money necessary to assure that this commitment will be satisfied in any year is, by its very nature, not subject to precise prediction.

The trial court has found that the plaintiffs were not provided with adequate care and treatment in the community. The court, however, stopped short of requiring and approving a plan to remedy the violations of the plaintiffs' right to treatment because of its conclusion that Senate Bill 120 had deprived the court of jurisdiction to implement a remedial plan. The features of such a plan and the adequacy of existing facilities and funding to implement such a plan have never been determined. The legislature, therefore, has never been presented with a situation where appropriations have been found to be insufficient to remedy violations of rights created by the Care and Treatment Act. We have no reason to speculate that the General Assembly would be unresponsive to a request for a supplemental appropriation in such a situation.[13] It is premature, therefore, to determine

whether implementation of the rights created by the Care and Treatment Act was intended by the legislature to be limited by availability of appropriations.

Declaratory judgments are not to be issued in the absence of an actual controversy. *Sullivan v. Board of County Comm'rs*, 692 P.2d 1106, 1110 (Colo.1985); *Community Tele-Communications, Inc. v. Heather Corp.*, 677 P.2d 330, 334 (Colo. 1984); *Beacom v. Board of County Comm'rs*, 657 P.2d 440, 447 (Colo.1983). In order for a declaratory judgment to be appropriate,

> the complaint must therefore state a question which is existent and not a mere academic or nonexistent question. In other words, there must be a justiciable issue or a legal controversy extant, and not a mere possibility that at some future time such a question may arise.

*Heron v. City and County of Denver*, 159 Colo. 314, 316, 411 P.2d 314, 315 (1966); *accord, e.g., Taylor v. Tinsley*, 138 Colo. 182, 183–84, 330 P.2d 954, 955 (1958); *see generally* §§ 13–51–101 to –115, 6A C.R.S. (1987) (Uniform Declaratory Judgments Law); C.R.C.P. 57. We conclude that the trial court abused its discretion in issuing a declaratory judgment on the question of whether the rights created by the Care and Treatment Act are limited by available appropriations because this issue is not a present controversy.

Our conclusion that declaratory judgment on this issue was inappropriate is reinforced by the fact that the Care and Treatment Act has been amended, as discussed in the following Section II B 2, and that the amended section now governs the rights of the mentally ill to adequate care and treatment and the obligations of the legislature to provide the funding necessary to satisfy those rights.

2.

■ The legislature responded to the trial court's ruling by passing Senate Bill 120,

---

**13.** The General Assembly is empowered to enact supplemental, special appropriations "by separate bills, each embracing but one subject." Colo. Const. art. V, § 32. "The power of the General Assembly over appropriations is plenary, subject only to constitutional limitations." *Colo.Gen. Assembly v. Lamm*, 738 P.2d 1156, 1169 (Colo.1987).

which amended section 27–10–116(1)(a) to provide:

> Any person receiving evaluation or treatment under any of the provisions of this article is entitled to medical and psychiatric care and treatment, with regard to services listed in section 27–1–201(1)(a) to (1)(e) [14] and services listed in rules and regulations authorized by section 27–1–202, suited to meet his individual needs, and delivered in such a way as to keep him in the least restrictive environment *subject to available appropriations.*

Ch. 210, sec. 4, § 27–10–116, 1986 Colo. Sess.Laws 1010, 1011. (Emphasis added.) The emphasized language also was inserted in other provisions of the Care and Treatment Act. *See* n. 5, *supra.*[15] When this amendment became law, the state defendants moved to dismiss, asserting that the statute as amended deprived the court of jurisdiction to implement the remedial plan. The trial court agreed, concluding that it lacked jurisdiction to order the defendants to implement the proposed plan:

> Based upon the current statute (i.e., C.R.S. 27–10–101, *et seq.*, as amended by Senate Bill 120), the Legislature has curtailed the rights given to these Plaintiffs. Pursuant to the Separation of Powers Doctrine, the Court lacks jurisdiction to

enter any orders enjoining the State Defendants to implement the remedial plan which was drawn to implement the formerly-existing rights of these Plaintiffs. However, the voluntary actions which will be taken by the State Defendants toward that end are of great public interest, and should be made known. Consequently, the Court deems it proper and within its jurisdiction to require it be furnished semi-annual reports of the actual steps taken by both State Defendants and Municipal Defendants toward the voluntary implementation of the remedial plan.

The defendants argue that the trial court properly dismissed the plaintiffs' claims for injunctive relief.[16] The state defendants assert that under the amended statute there is no unlimited right to community based services and therefore no mandate for the creation of additional community programs.[17] In fact, the state contends that had the trial court ordered the implementation of the remedial plan, its intervention in a resource allocation decision would have violated the separation of powers doctrine.

Article III of the Colorado Constitution provides:

---

**14.** Section 27–1–201(1)(a) to (e) is part of a definition of "community mental health center," which provides:

> (1) "Community mental health center" means either a physical plant or a group of services under unified administration or affiliated with one another, and including at least the following services provided for the prevention and treatment of mental illness in persons residing in a particular community in or near the facility so situated:
> (a) Inpatient services;
> (b) Outpatient services;
> (c) Partial hospitalization;
> (d) Emergency services;
> (e) Consultative and educational services.

**15.** We do not conclude that Senate Bill 120 exhibits any withdrawal by the General Assembly from its commitment to provide services to the mentally ill under the Care and Treatment Act. Instead, it appears to reflect an understandable desire to maintain control of the public fisc and not to expose it to unconditional obligations in absence of sufficient information to permit such obligations to be reliably quantified.

**16.** The named plaintiffs also asserted a damages claim for the violation of their rights under the Care and Treatment Act prior to its amendment by Senate Bill 120. The trial court dismissed this claim, concluding that the Care and Treatment Act "provides neither an express nor an implied cause of action for damages." We agree with the court's conclusion that the legislature did not intend to provide for enforcement by individual claims for damages.

**17.** The defendants emphasize that generally in cases of this kind, a court is to apply the law in effect at the time it renders its decision. *See, e.g., Bradley v. Richmond School Board,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974); *Miami Int'l Realty Co. v. Town of Mt. Crested Butte,* 607 F.Supp. 448, 451 (D.Colo. 1985). This has cogency in the context of this case, since the court is overseeing the development of a mental health plan that will be applied prospectively. *See City and County of Denver v. Denver Tramway Corp.,* 187 F.2d 410, 416–17 (10th Cir.1951). In fact, the parties appear to agree that the amended law applies in this case, but they disagree over what it means.

The powers of the government of this state are divided into three distinct departments,—the legislative, executive and judicial; and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any power properly belonging to either of the others, except as in this constitution expressly directed or permitted.

The power of appropriation is vested in the General Assembly. *Colorado General Assembly v. Lamm,* 700 P.2d 508, 519 (Colo. 1985). The executive is given the duty to see that the laws are faithfully executed, and in order to fulfill this duty, the executive has the authority to administer the funds appropriated by the legislature for programs enacted by the legislature. *Anderson v. Lamm,* 195 Colo. 437, 442, 579 P.2d 620, 623 (1978). This authority allows the executive to make "specific staffing and resource allocation decisions." 195 Colo. at 442, 579 P.2d at 624. The state defendants argue that once the legislature appropriates funds for services to the chronically mentally ill, the executive alone has the authority to determine how the money will be allocated, and the judicial branch may not interfere in this decision. They rely on this court's statement in *Colorado State Department of Health v. Geriatrics, Inc.,* 699 P.2d 952, 959 (Colo.1985):

> "The separation of powers doctrine imposes upon the judiciary a proscription against interfering with the executive or legislative branches...." This doctrine insures that the judiciary will not "under the pretense of deciding a case," preempt an executive agency from exercising powers properly within its own sphere.

(Citations omitted.)

The plaintiffs argue that implementation of a remedial plan by the court would not violate the separation of powers doctrine. Moreover, they contend that if the court could not implement the plan, it would be deprived of its constitutionally based power to interpret and enforce the law. We agree

that implementation of a remedial plan in this case would not violate the constitutional mandate of separation of powers, since the court would simply be interpreting the Care and Treatment Act, determining the requirements of that act, and directing the defendants to spend the funds appropriated by the legislature in accordance with those requirements. As we pointed out in *United Presbyterian Association v. Board of County Commissioners,* 167 Colo. 485, 494, 448 P.2d 967, 971 (1968), "the judiciary is the final authority in the construction of the constitution and the laws...."

As the Massachusetts Supreme Judicial Court stated in *Blaney v. Commissioner of Correction,* 374 Mass. 337, 372 N.E.2d 770 (1978), courts traditionally have had the power to issue orders "directing public officials to carry out their lawful obligations." *Id.* 372 N.E.2d at 774. In that case, the trial court supervised the development of a specific plan regulating the classification of protective custody inmates. The Massachusetts Supreme Judicial Court approved the trial court's actions, pointing out that "the administrative function of detailing compliance plans rests exclusively with the department." *Id.* In this case, as in *Blaney,* the court did not develop the mental health plan itself, but instead allowed the state to do so. The trial court's review of the plan for statutory compliance would not require it to make allocation decisions. Instead, it would simply approve or reject the plan developed by the executive based upon criteria derived from judicial construction of the statute.[18]

As the plaintiffs assert, the trial court erred in its ruling that the amendment of the act deprived it of jurisdiction to protect the class members' rights. The amended act not only retains the "right to treatment" provision upon which the court based its finding of a statutory right, but also clarifies and reinforces that right by making explicit reference to the mental health services particularized in section 27–

---

**18.** We need not determine at this time whether the judiciary would have any role in reviewing executive resource allocation decisions in partial implementation of a remedial plan in circumstances where the legislature does not appropriate sufficient funds for full implementation.

1–201(1)(a) to (1)(e) and in rules and regulations authorized by section 27-1-202. It is only the implementation of the right that is made subject to available appropriations. *Cf. Alexander v. Polk,* 750 F.2d 250, 260–61 (3d Cir.1984) (applicants for benefits under federal food program have property interest where they have legitimate expectation of receiving benefits under statutory and regulatory criteria; existence of statutory funding limits simply imposes an additional condition on receipt of benefits); *Halderman v. Pennhurst State School & Hospital,* 612 F.2d at 102 (a provision in Pennsylvania's Mental Health and Mental Retardation Act of 1966 limiting counties' financial obligation for mental health services in the event of insufficient state funding may imply that the right to treatment is not unconditional, but no right is without some limitations). Senate Bill 120 does not limit the substantive rights provided under the Care and Treatment Act, but does explicitly restrict the remedies available for the fulfillment of those rights. After the trial court approved the defendants' plan, it could have directed them to implement it until the appropriated funds ran out. The defendants then would have had the obligation to bring to the legislature's attention the inadequacy of the funding to satisfy the plaintiffs' rights. *See Massachusetts Coalition for the Homeless v. Secretary of Human Services,* 400 Mass. 806, 511 N.E.2d 603 (1987). To the extent that the required services could not be provided in some manner not requiring additional funding, and to the extent that the necessary appropriations to provide the required services were not forthcoming, the court would not be able to order and implement full relief. Thus, the trial court erred in finding that it lacked jurisdiction to approve and implement the remedial plan.[19]

## C.  PURCHASE OF SERVICES ACT

The plaintiffs argue that the trial court erred in denying their claims under the Community Mental Health Services Purchase Act, §§ 27-1-201 to -208, 11 C.R.S. (1982 & 1988 Supp.) (Purchase of Services Act). This act provides authority for the Colorado Department of Institutions to purchase community mental health services from clinics, community mental health centers, hospitals and other agencies. Section 27-1-203, 11 C.R.S. (1982), states that:

> In order to encourage the development of preventive, treatment, and rehabilitative services through new community mental health programs, the improvement and expansion of existing community mental health services, and the integration of community with state mental health services, there is established a program to purchase community mental health services by the department of institutions.

The act specifies the types of services that may be purchased and the limits on the amount the state can pay for these services, expressed as a percentage of cost. § 27-1-204, 11 C.R.S. (1982). Section 27-1-205 and the rules promulgated under the Purchase of Services Act, *see* § 27-1-202, 11 C.R.S. (1982 & 1988 Supp.), also specify the standards that mental health centers, clinics and hospitals must meet in order to qualify for state funding.

### 1.

The trial court, in its May 7, 1985, order, noted that the Department of Institutions had entered into three contracts with the Denver Department of Health and Hospi-

---

**19.** The municipal defendants raise an additional argument relating to liability under the Care and Treatment Act. They point out that DHH withdrew as a community mental health center at the end of 1984 and that they are no longer obligated to provide the community mental health services required under the Care and Treatment Act. In March 1986, they moved for summary judgment and requested that the trial court dismiss them from any future proceedings in the case related to prospective remedies. The court denied this motion. We believe that such denial was proper in order to permit the trial court full scope in fashioning relief for past violations of the Care and Treatment Act and in view of DHH's continuing role as a long-term and short-term inpatient care facility. *See* §§ 27-10-105 to -109, 11 C.R.S. (1982 & 1988 Supp.). Furthermore, the municipal defendants may be liable for damages for past violations of the rights asserted by the plaintiffs in their various claims to the extent that damages remedies are available.

tals for the purchase of community mental health services within the northwest Denver catchment area for the fiscal year ending June 30, 1982. The court determined that the state, in purchasing mental health services from the municipal defendants, had failed to incorporate into these contracts adequate provisions to protect the rights of the chronically mentally ill under the Care and Treatment Act. However, the court did not find that the plaintiffs had rights under the Purchase of Services Act independent of those granted under the Care and Treatment Act, concluding that the provisions relating to the purchase of community mental health services "create only an 'encouragement through a purchasing' scheme."

The court also found that the contracts for the purchase of services required DHH to adhere to the rules and regulations promulgated under the Purchase of Services Act. The court interpreted these regulations as requiring the municipal defendants to provide services to *all* class members in need and determined that DHH had not fully complied with these regulations. However, the court noted that it did "not intend to imply that [the] implementary rules and regulations in and of themselves create any particular rights for the benefit of the Plaintiffs." Instead, the court concluded that the rules and regulations must be construed in a manner to afford class members the rights granted them under the Care and Treatment Act. Ultimately, in its October 10, 1986, "Final Judgment Pursuant to C.R.C.P. 54(b)," it dismissed the plaintiffs' claims under the Purchase of Services Act.

2.

■ The plaintiffs argue that the Purchase of Services Act provides class members with substantive rights and that their claims under this statute were improperly dismissed. However, after reviewing the purposes and statutory framework of the act, we conclude that the Purchase of Services Act is merely a legislative encouragement of mental health programs that confers no substantive rights on the plaintiffs. *Cf. Pennhurst State School and Hospital*

*v. Halderman,* 451 U.S. 1, 18–27, 101 S.Ct. 1531, 1540–1544, 67 L.Ed.2d 694 (1981) (concluding that the Developmentally Disabled Assistance and Bill of Rights Act is merely a funding statute and creates no substantive rights to treatment). As the defendants point out, the act encourages, but does not require, the development of mental health services. Although subsections 27–1–204(2) and (4)(a) contain language providing that each year the general assembly "shall appropriate" funds for the purchase of certain services, this language is necessarily precatory, since one legislature cannot bind future legislatures with respect to appropriations. *See, e.g.,* Colo. Const., art. V, § 32; *Anderson v. Lamm,* 195 Colo. at 443, 579 P.2d at 624. When this language is considered in the context of the statute as a whole, it becomes clear that these provisions do not guarantee any level of services or create any rights in persons receiving services. For instance, section 27–1–204(6), 11 C.R.S. (1982), contemplates that local governmental bodies may reduce financial support for community mental health services, and specifically provides that the state may respond to any such reduction with a proportional reduction in state payments.

The plaintiffs also contend that the rules promulgated pursuant to the Purchase of Services Act provide them with the right to community-based mental health services. Rule 2.1, 2 C.C.R. 502–2 (1985), mandates that community mental health centers provide certain services, including day care, emergency and crisis services, consultation and education services, and access to vocational and rehabilitation services, to "all persons in need who are residents of or located in the service area," and Rule 2.4.1, 2 C.C.R. 502–2 (1985), requires that mental health center services "be accessible to all residents of the service area." The trial court interpreted these rules as mandating the provision of these services to all class members in need and pointed out that DHH is required by contract to "strictly adhere to" these rules and regulations. The plaintiffs assert that these rules create a right to community mental health servic-

es for all chronically mentally ill persons in northwest Denver. We disagree.

The Purchase of Services Act is intended to encourage the development of community mental health programs and does not itself create substantive rights to community treatment. Therefore, the regulations enacted thereunder cannot create such rights, and the plaintiffs' reliance on the rules is misplaced. As we stated in *Cohen v. State Department of Revenue,* 197 Colo. 385, 390, 593 P.2d 957, 961 (1979), "[a] regulation may only carry into effect the will and policy established by the legislature and may not modify or contravene the existing statute." *Accord Miller Int'l, Inc. v. Department of Revenue,* 646 P.2d 341, 344 (Colo.1982); *Travelers Indemnity Co. v. Barnes,* 191 Colo. 278, 552 P.2d 300 (1976). Any regulation that is inconsistent with or contrary to a statute is void. *Miller Int'l,* 646 P.2d at 344; *Weed v. Occhiato,* 175 Colo. 509, 511, 488 P.2d 877, 879 (1971). The rules set forth in 2 C.C.R. 502.2, which were promulgated under the Purchase of Services Act, do not create substantive rights, but simply describe the minimum standards that community mental health centers, clinics, and hospitals must meet to qualify as vendors of services under the Purchase of Services Act.

We also note that in applying these regulations the Department of Institutions has not interpreted them as imposing an obligation on entities that accept state funding to develop and expand mental health programs. Instead, these rules are read as imposing a non-discrimination requirement on facilities that accept funding under the act. As the Director of the State Division of Mental Health testified at trial, the rules simply state that a community mental health center:

is not to discriminate on the basis of class or whatever, that the people who live in the catchment area, all of them,

should have access to services without one or the other group being excluded on that basis on some sort of discriminatory policy.

The administrative interpretation of these regulations is entitled to great weight by the courts. *Van Pelt v. State Bd. for Community Colleges,* 195 Colo. 316, 323, 577 P.2d 765, 770 (1978).

The trial court properly dismissed the plaintiffs' claims under the Purchase of Services Act.

## D. FEDERAL REHABILITATION ACT

The plaintiffs assert that the trial court erred in dismissing their claim based on section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1982) (Federal Rehabilitation Act), which states in pertinent part:

No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.... [20]

We agree that dismissal was improper.

### 1.

█ In ruling on the defendants' motions to dismiss in its order of July 7, 1982, the trial court concluded that certain remedies requested by the plaintiffs pursuant to their section 504 claim were not available and granted the motions "as to the request for private rights and institutional reform, including the creation of programs." In its May 7, 1985, ruling, the trial court noted the earlier dismissal, entered by a previous judge, and apparently considered itself bound by that earlier order. The court found, however, that:

[T]he term "handicapped individual" means ... any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such impairment, or (iii) is regarded as having such an impairment.

**20.** It is not disputed that the state and municipal defendants receive federal funding for their mental health programs or that the chronically mentally ill come within the definition of handicapped persons under 29 U.S.C. § 706(7)(B) (Supp.1987):

[F]or the most part, Health and Hospitals' physical health and mental health programs are not designed for the severely, chronically mentally ill persons who, because of their illness, are unable to actively seek out or to pursue appropriate care and treatment for their mental health problems.

The court then determined that mental health services were not equally accessible to all classes of chronically mentally ill persons and that in this respect the mental health program was "both overtly and covertly selective and discriminatory." The court concluded that a possible remedy for such discrimination consistent with its July 7, 1982, order would be injunctive relief directing that the programs curtailed in 1981 be reopened or expanded to previously existing levels. Inexplicably, however, the court then ruled that the plaintiffs had not established a cognizable claim for relief under section 504 of the Federal Rehabilitation Act.

The plaintiffs contend that the failure to provide the more severely disabled persons access to services constitutes discrimination solely on the basis of particular handicaps, in violation of section 504. Other courts have determined that discrimination on the basis of severity of handicap violates the Federal Rehabilitation Act. *See Plummer v. Branstad*, 731 F.2d 574, 578 (8th Cir.1984) ("we assume that the *severity* of the plaintiffs' handicaps is itself a handicap which, under section 504 of the 1973 Rehabilitation Act, cannot be the sole reason for denying them [adult day care] funding"); *Homeward Bound, Inc. v. Hissom Memorial Center*, No. 85–C–437–E (N.D.Okla. July 24, 1987) [available on WESTLAW, 1987 WL 27104] (institution for mentally retarded persons discriminated on basis of severity of handicap); *Garrity v. Gallen*, 522 F.Supp. 171, 215 (D.N.H.1981) (same). We are persuaded that these cases correctly interpret section 504.

The trial court's findings indicate that the mental health program discriminated against some members of the plaintiff class based on severity of handicap. The record contains evidence that only the higher func-

tioning patients are able to travel to the facilities where day care, vocational rehabilitation, and other programs are located, while the more severely ill or lower functioning individuals are unable to participate. The record also contains evidence that outreach services are not available at most of the boarding houses and nursing homes in the northwest Denver catchment area, and that the services that are offered are limited in scope. Without outreach services, the most severely ill are effectively denied access to a variety of important programs. Finally, the record provides support for the plaintiffs' contention that the termination of certain programs in 1981 and the reorganization of others at the end of 1984 exacerbated the access problems of the more severely ill. This evidence in turn supports the trial court's finding of discrimination. Therefore, the trial court erred in dismissing the plaintiffs' claim under section 504 of the Federal Rehabilitation Act. On remand the trial court should make specific factual findings concerning discrimination based on handicap and on the basis of those findings should determine whether the plaintiffs have established a violation of section 504.

### 2.

The question of remedies available for violation of section 504 may be before the trial court on remand, and we elect to offer guidance on this issue. In its May 7, 1985, order, as noted above, the trial court suggested that a possible remedy would be injunctive relief directing the reopening or expansion of programs to provide the level of services available before cutbacks in 1981. The plaintiffs contend that the court was correct in its suggestion that injunctive relief would be available for the reopening of programs, but they assert that the court could have ordered broader relief to remedy past discrimination, including the development of new programs. They rely on *Homeward Bound, Inc. v. Hissom Memorial Center*, No. 85–C–437–E (N.D. Okla. July 24, 1987) [available on WESTLAW, 1987 WL 27104], in which the court concluded that there is a right to effective

and integrated services under section 504 of the Federal Rehabilitation Act and that

the underdevelopment of a community services system by the Defendants constitutes a continuation of the original and continuing discrimination practiced by the State against retarded people; the affirmative development of community services is necessary to remedy this effect.

Slip op. at 51.

We conclude that the plaintiffs are not entitled to the broad injunctive relief they seek. In *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), the United States Supreme Court considered the meaning of section 504 in the context of a claim by a person with a serious hearing disability that the statute was violated by the denial of her application for admission to a college nursing program because of the physical limitations imposed by her disability. The court rejected the applicant's contention that the college was required under section 504 to modify its nursing program to permit her to participate, and concluded that "neither the language, purpose, nor history of § 504 reveals an intent to impose an affirmative action obligation on all recipients of federal funds." *Id.* at 411, 99 S.Ct. at 2361. The Court also determined that while "reasonable" modifications of a program may be required under section 504, the program need not be so substantially changed as to alter its fundamental nature. Similarly, in *Alexander v. Choate*, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985), the Court again discussed section 504, noting that *Southeastern Community College v. Davis*

struck a balance between the statutory rights of the handicapped to be integrated into society and the legitimate interests of federal grantees in preserving the integrity of their programs: while a grantee need not be required to make "fundamental" or "substantial" modifications to accommodate the handicapped, it may be required to make "reasonable" ones.

The balance struck in *Davis* requires that an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers. The benefit itself, of course, cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled; to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made.

*Id.* 469 U.S. at 300–01, 105 S.Ct. at 719–20 (citation omitted).

Other courts construing section 504 have emphasized that the statute requires only "reasonable" changes in programs. As the court stated in *Parks v. Pavkovic*, 753 F.2d 1397, 1409 (7th Cir.1985), *cert. denied* 473 U.S. 906, 105 S.Ct. 3529, 87 L.Ed.2d 653 (1985):

We do not interpret [section 504] to force states to create special programs for handicapped children.... [Section 504] protects a handicapped person from being denied the same benefit ... as a normal person but does not require the state to devote extra resources to bringing the handicapped up to the level of the normal.

*See also Garrity v. Gallen*, 522 F.Supp. 171, 209 (D.N.H.1981) (under section 504, there is "no statutory or regulatory mandate to states and their agencies to expend substantial funds or assume excessive administrative burdens for the purpose of removing barriers to the handicapped"); *New Mexico Ass'n for Retarded Citizens v. State of New Mexico*, 678 F.2d 847, 855 (10th Cir.1982) ("modification of existing programs may be required where the financial burden would not be excessive and the accommodation would enable the handicapped children to realize the benefits of the ... program). In considering the scope of any injunctive relief to be ordered on remand, the trial court should follow the lead of the United States Supreme Court in *Southeastern Community College v. Davis* and *Alexander v. Choate* and require the defendants to make only those accommodations reasonably necessary to assure meaningful access to the mental health programs available in the northwest

Denver catchment area for those members of the plaintiff class who can realize the benefits of such programs.[21]

The named plaintiffs in *Arevalo* also argued to the trial court that damages should be available as a remedy for violation of section 504, but the court rejected that contention. While there is a consensus that section 504 creates a private right of action for declaratory or injunctive relief, federal courts are divided on the question of whether a damages remedy is available for violation of section 504. The courts holding that there is no damages remedy generally have relied on legislative intent. *Longoria v. Harris*, 554 F.Supp. 102 (S.D.Tex.1982); *Carter v. Independent School Dist. Number 6*, 550 F.Supp. 172 (W.D.Okla.1981); *Boxall v. Sequoia Union High School Dist.*, 464 F.Supp. 1104 (N.D.Cal.1979). Some of these courts have pointed out that there is an explicit administrative remedy for violations of the Federal Rehabilitation Act—termination of federal funds. 45 C.F.R. § 80.8 (1987). They have also concluded that a damages remedy would frustrate the purpose of the Rehabilitation Act, which is to promote and expand opportunities for handicapped individuals. As the court stated in *Ruth Anne M. v. Alvin Independent School Dist.*, 532 F.Supp. 460 (S.D.Tex.1982):

 [T]he implication of a damage remedy would portend a potentially massive financial liability upon recipients of federal funds.... This exposure could serve as a significant disincentive to the solicitation or acceptance of federal financial assistance, and hence a significant deterrent to the promotion and expansion of opportunities for handicapped individuals....

*Id.* at 473. *See also Manecke v. School Bd. of Pinellas County*, 553 F.Supp. 787, 789 (M.D.Fla.1982), *rev'd on other grounds*, 762 F.2d 912 (11th Cir.1985), *cert. denied*, 474 U.S. 1062, 106 S.Ct. 809, 88 L.Ed.2d 784 (1986).

The courts holding that damages are available under the Federal Rehabilitation Act conclude that Congress intended to allow for enforcement through actions for damages, noting that the Act does not expressly limit the availability of damages. *Kling v. County of Los Angeles*, 769 F.2d 532, 534 (9th Cir.) (damages are particularly appropriate where injunctive relief will not remedy the harm), *rev'd on other grounds*, 474 U.S. 936, 106 S.Ct. 300, 88 L.Ed.2d 277 (1985); *Miener v. Missouri*, 673 F.2d 969, 977–78 (8th Cir.) (damages available as necessary remedy for discrimination), *cert. denied*, 459 U.S. 909, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982); *Nelson v. Thornburgh*, 567 F.Supp. 369, 382 (E.D. Penn.1983) ("the availability of a damage remedy increases the deterrent effect of the non-discrimination law."), *aff'd*, 732 F.2d 147 (3rd Cir.1984), *cert. denied*, 469 U.S. 1188, 105 S.Ct. 955, 83 L.Ed.2d 962 (1985); *Hurry v. Jones*, 560 F.Supp. 500, 509–12 (D.R.I.1983) (compensatory damages available since administrative remedies inadequate); *Gelman v. Department of Education*, 544 F.Supp. 651, 654 (D.Colo.1982) (compensatory but not punitive damages available); *Gregg B v. Board of Education of Lawrence School District*, 535 F.Supp. 1333, 1339–40 (E.D.N.Y.1982) (purpose of act furthered by availability of damages); *Patton v. Dumpson*, 498 F.Supp. 933, 937–39 (S.D.N.Y.1980) (money damages appropriate where this is the only way to compensate a victim of past discrimination); *Poole v. South Plainfield Bd. of Education*, 490 F.Supp. 948, 949 (D.N.J. 1980) (for plaintiffs, injunctive relief would come too late to be an effective remedy).

We make no definitive determination concerning the availability of damages to remedy a violation of section 504 for the purpose of the present case at this time because of the unsettled state of the law. The United States Supreme Court has expressly recognized this issue but has not had the occasion to set it to rest. *Smith v. Robinson*, 468 U.S. 992, 1020 n. 24, 104

---

21. DHH is no longer the provider of community mental health services in the northwest Denver catchment area. In fashioning any injunctive relief the court must limit such relief as to the municipal defendants to any that would be appropriate to remedy the effects of past discrimination.

S.Ct. 3457, 3472 n. 24, 82 L.Ed.2d 746 (1984) ("Without expressing an opinion on the matter, we note that courts generally agree that damages are available under § 504, . . ."). On remand, in absence of a controlling decision by the United States Supreme Court, the trial court should consider all the authorities available to it at the time it rules on the issue and should make its ruling informed by the reasoning of those authorities.

### E. COMMON LAW DUTY OF CLINICAL CARE

■ The plaintiffs assert that the trial court erred in dismissing their claim that the municipal defendants violated the duty of clinical care owed to the plaintiff class. They contend that health care providers have a common law duty to exercise reasonable care and diligence in the treatment of their patients, and that such a health care provider may be found liable for abandoning patients who are still in need of care without providing adequate notice. *See Bolles v. Kinton,* 83 Colo. 147, 149, 263 P. 26, 27 (1928) ("A physician cannot discharge a case and relieve himself of responsibility for it by simply staying away without notice to the patient."). *Cf. Katsetos v. Nolan,* 170 Conn. 637, 368 A.2d 172, 182 (1976) (a physician is under a duty to provide care as long as the patient needs it and should not leave his patient at a critical stage without notice, but plaintiff must prove that the failure to observe this duty was the proximate cause of injury); *Meeks v. Coan,* 165 Ga.App. 731, 302 S.E.2d 418, 420 (1983) (recognizing that a physician may be liable for abandoning a case without reasonable notice, but noting that no recovery is possible unless injury results from the abandonment). The plaintiffs argue that the existence of this common law duty of clinical care gains support from this court's adoption of Restatement Second of Torts §§ 323 and 324(A).[22] *See Jefferson County School Dist. R–1 v. Justus,* 725 P.2d 767, 770 (Colo.1986); *De Caire v. Public Service Co.,* 173 Colo. 402, 408, 479 P.2d 964, 967 (1971).

The plaintiffs argue that the municipal defendants violated this duty by abruptly reducing the community support services available to the mentally ill on June 1, 1981, and by the manner in which DHH withdrew as a community mental health center on January 1, 1985. In both instances, patients received a maximum of thirty days notice, while some received no notice at all. The plaintiffs assert that the municipal defendants should be held accountable for their breach of this duty by being required to provide services that will compensate class members for the injuries they suffered when mental health services were reduced. In addition, the plaintiffs assert that they should be free to seek damages for this breach.

The imposition of a duty raises serious policy implications, *see Taco Bell, Inc. v. Lannon,* 744 P.2d 43, 46 (Colo.1987); *University of Denver v. Whitlock,* 744 P.2d 54, 56–7 (Colo.1987); *Jefferson County School Dist. R–1 v. Justus,* 725 P.2d at 769. At present, however, we need not determine whether such a duty exists because we conclude that the plaintiffs' claims for both injunctive relief and damages are not appropriate for resolution in the context of this class action as presently structured. Furthermore, we conclude that the existence of such a duty is more appropriately to be considered in the context of the particular facts giving rise to the asserted duty.

**22.** Section 323 provides that
[o]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.
Section 324 describes the duty of one who takes charge of another who is helpless, and section 324(A) outlines the liability an actor owes to third persons for negligent performance of services.

This case presents difficulties in assessing both liability and damages.[23] Each class member asserting injury resulting from the municipal defendants' violation of the common law duty of clinical care would have to establish individually the services he or she was receiving prior to June 1, 1981, or January 1, 1985, as well as the services received after the change in the delivery of mental health services. Once a claimant established that the mental health services provided to him or her were reduced or terminated without adequate notice, the claimant would still have to establish the harm suffered as a result of this reduction, and it would then be necessary to fashion appropriate monetary or injunctive relief. This case appears similar to *Rice v. City of Philadelphia*, 66 F.R.D. at 20, in which the court noted:

> In the present case, not only would the calculation of the amount of damages depend upon the individual facts of each claimant's case, but virtually all of the issues would have to be litigated individually in order to determine whether a particular alleged class member was entitled to any damages at all. Each claimant, in order to obtain the benefits of the class suit, would have to establish his membership in the class (*i.e.*, that his rights were violated).

We do not foreclose the possibility, however, that the class action device may prove appropriate for resolving some of the issues relating to this claim. Pursuant to C.R.C.P. 23(c)(4), a court has the discretion to limit the issues in a class action to those parts of a lawsuit that lend themselves to convenient use of the class action motif. *Williams v. Owens–Illinois, Inc.*, 665 F.2d 918, 929 (9th Cir.1982), *cert. denied*, 495 U.S. 971, 103 S.Ct. 302, 74 L.Ed.2d 283 (1982). *Accord, e.g., Windham v. American Brands, Inc.*, 565 F.2d 59, 67–70 (4th Cir.1977), *cert. denied*, 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978). On remand, the trial court should consider whether the class can be divided into smaller sub-classes that were similarly situated in 1981 or 1984, and that were similarly affected by the defendants' actions with respect to liability, damages, or both.

### F. 42 U.S.C. § 1983, AND ARTICLE II, § 25, OF THE COLORADO CONSTITUTION

The plaintiffs argue that the trial court improperly dismissed their claim based on the Federal Civil Rights Act, 42 U.S.C. § 1983 (1982), for deprivation of federal constitutional and statutory rights under color of state law. It is well established that section 1983 itself creates no substantive rights; it merely provides a remedy for deprivations of federal rights protected by the United States Constitution or federal laws. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816, 105 S.Ct. 2427, 2432, 85 L.Ed.2d 791 (1985); *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980); *Baker v. McCollan*, 443 U.S. 137, 146, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979). However, not all federal statutory rights may be enforced through section 1983. In *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), the United States Supreme Court noted two exceptions to the applicability of section 1983 to statutory violations. First, "when the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983." *Id.* at 20, 101 S.Ct. at 2626. Second, a section 1983 remedy may be foreclosed when the statute at issue does not create "rights, privileges, or immunities secured by the ... laws" that are enforceable under section 1983. *Id.* at 19, 101 S.Ct. at 2625. *See also Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 28–29, 101 S.Ct. 1531, 1545–46, 67 L.Ed.2d 694 (1981); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150–51 n. 5, 90 S.Ct. 1598, 1604–05 n. 5, 26 L.Ed.2d 142 (1970).

The plaintiffs claim that the defendants deprived the class members of rights guar-

---

**23.** The pleadings indicate that only the named plaintiffs in *Arevalo* have asserted claims for damages for violation of a duty of clinical care.

anteed under the Federal Rehabilitation Act. The trial court determined that a deprivation of rights under section 504 of the Federal Rehabilitation Act cannot be vindicated through a section 1983 action. Federal courts that have considered this issue disagree over whether an action pursuant to section 504 is possible within the framework of 42 U.S.C. § 1983. *Compare Manecke v. School Bd. of Pinellas County,* 553 F.Supp. at 790–91 (concluding that a damages remedy under either § 504 or § 1983 would be inconsistent with the purposes of the Federal Rehabilitation Act) *and Ruth Anne M v. Alvin Independent School Dist.,* 532 F.Supp. at 475–76 (same); *with Pushkin v. Regents of University of Colorado,* 658 F.2d 1372 (10th Cir.1981) (recognizing that a § 1983 claim may be based on § 504) *and Boxall v. Sequoia Union High School Dist.,* 464 F.Supp. at 1112–13 (damages are not available under § 504, but such a claim could be asserted under § 1983). At least one court has suggested that since most courts have recognized a private right of action for injunctive or declaratory relief under section 504, and many courts have recognized a damages action, the Federal Rehabilitation Act provides a comprehensive range of remedies for enforcement and an action to enforce the act under section 1983 is unnecessary. *See Miener v. Special School Dist. of St. Louis County,* 580 F.Supp. 562, 567–68 (E.D.Mo.1984), *rev'd on other grounds,* 800 F.2d 749 (8th Cir.1986). However, since federal courts disagree on this issue and further developments, including resolution of the related question of the types of relief available for violation of section 504 of the Federal Rehabilitation Act, may clar-

ify the law before the trial court considers this question on remand, we decline to make a definitive ruling at this point. On remand, the trial court will be free to consider any applicable holdings by the United States Supreme Court and the other most recent court decisions before resolving this issue.

■ The plaintiffs also assert that there is a federal constitutional due process right to community based mental health services for certain members of the plaintiff class,[24] and that a corresponding state right also exists under article II, section 25, of the Colorado Constitution. The plaintiffs urge this court to address the existence of a federal or state constitutional right to treatment in the community. They anticipate that there will not be adequate funding to implement the state's remedial plan[25] and they ask this court to determine whether the United States and Colorado Constitutions require that the remedial plan be more fully implemented. However, at this point the question is premature. It is not clear how much money is available to fund any court-approved remedial plan. In addition, if the amount appropriated is not sufficient, the defendants must first request that the legislature provide the funding required to implement the plan fully. *See Blaney v. Comm'r of Correction,* 372 N.E.2d at 774 ("the defendants have not shown that they could not fulfill the mandate of [the statute] within the appropriations of the department or that the Legislature has declined to appropriate funds necessary to permit the defendants to fulfil their statutory duty"). Only after the defendants have attempted to implement the plan fully and are unable to do so should

24. The plaintiffs' contention that there is a due process right to community treatment under the fifth and fourteenth amendments is based largely on the concept of the "revolving door" patient. A "revolving door" patient at some point is institutionalized and stabilized on medication, and is then released into the community. Unable to cope in the community without adequate support services, this patient deteriorates and may end up incarcerated within the criminal justice system or re-institutionalized through the mental health system. The plaintiffs argue that without appropriate community treatment, the mentally ill are likely to be deprived of their liberty. In support of this argument they rely

on *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982).

The plaintiffs also alleged that their federal constitutional rights under the first and eighth amendments had been violated. As the trial court found, there does not appear to be any basis for these claims.

25. During the same session that the general assembly passed Senate Bill 120, it also made an appropriation of more than $3.5 million in new funds specifically for community programs for the chronically mentally ill, with up to 60% of those funds available to the City and County of Denver.

this court reach the issue of whether Senate Bill 120 has placed an unconstitutional limit on the rights of the members of the plaintiff class. We conclude that the plaintiffs' claims under section 1983 and the state constitution were properly dismissed but that the dismissal should be without prejudice to the right to reassert the due process claims based upon the care and treatment actually provided to the relevant class under the Care and Treatment Act as amended by Senate Bill 120.

### III.

In summary, we conclude that the trial court abused its discretion in certifying the class (Section II A), that the trial court erred in dismissing the plaintiffs' claim for injunctive relief under the Care and Treatment Act (Section II B), that the trial court properly dismissed the plaintiffs' claims under the Purchase of Services Act (Section II C), that the trial court erred in dismissing the plaintiffs' claims under the Federal Rehabilitation Act (Section II D), that the trial court erred in dismissing the plaintiffs' claims for breach of an asserted common law duty of clinical care without giving further consideration to the appropriateness of adjudicating these claims in a class action (Section II E), and that the trial court's dismissal of the plaintiffs' claims under 42 U.S.C. § 1983 and article II, section 25, of the Colorado Constitution should be sustained because the claims are premature (Section II F).

We affirm the trial court's judgment in part, reverse it in part, and remand the case to that court for further proceedings consistent with this opinion.

VOLLACK, J., concurs in part and dissents in part, and ERICKSON, J., joins in the concurrence and dissent.

VOLLACK, Justice, concurring in part and dissenting in part:

I agree with the majority that, "[g]iven the extent of the class and the wide range of issues presented in this case, the [trial] court should have more carefully delineated the nature of each claim for relief and the categories of plaintiffs who could ask for such relief." At 794. For this reason,

remanding the case in order to define the classes of litigants more carefully is the appropriate conclusion at this time. I also agree that section 27–10–116 of the Care and Treatment Act, as modified by Senate Bill 120, applies both to voluntary and involuntary patients, and that neither the doctrine of separation of powers nor passage of Senate Bill 120 deprives the trial court of jurisdiction to implement a remedial plan up to the amount of available appropriations. See at 801.

### I.

I disagree with the majority's conclusion in Part II.B.1 that "the trial court prematurely and unnecessarily addressed the issue of whether persons afflicted with chronic mental illness have rights created by the Care and Treatment Act [prior to passage of Senate Bill 120] that must be satisfied without regard to the amount of money appropriated by the legislature for that purpose." At 798. The trial court's determination of the possibility of ordering monetary relief in excess of available appropriations is no more "premature and unnecessarily addressed" prior to passage of Senate Bill 120 than it is after passage of Senate Bill 120, yet the majority does not hesitate to reach the propriety of the latter issue in Part II.B.2. If anything, the trial court's determination of the extent of relief under the Care and Treatment Act prior to passage of Senate Bill 120 is *more* pressing because the claims in this case arose and will be determined under the law in effect prior to passage of Senate Bill 120. By failing to address the propriety of the trial court's holding that the right to care and treatment under section 27–10–116 was not limited to the amount of available appropriations, the majority leaves open the possibility that the trial court could implement a remedial plan pursuant to section 27–10–116 in excess of the amount appropriated by the General Assembly. I believe that such a possibility is foreclosed because whatever benefits may be conferred by a statute such as section 27–10–116 are limited to the amounts appropriated by the General Assembly even in the absence of express language to that effect.

The circumstances under which Senate Bill 120 was passed indicate that the General Assembly intended to limit the relief that could be ordered for violation of section 27–10–116 to the amount of available appropriations. Senate Bill 120 was a response to the trial court's invitation to the General Assembly to make "crystal clear" its intent concerning availability of monetary relief for violation of the Care and Treatment Act. The title of Senate Bill 120, though not controlling, supports the view that the General Assembly intended to limit monetary relief to the amount of available appropriations. Senate Bill 120 is entitled "An Act Concerning *Clarification* That Any Right To Mental Health Services Is Subject To The General Assembly's Right To Establish, By Appropriation, The Level Of Service To Be Rendered." Ch. 210, § 4, § 27–10–116, 1986 Colo.Sess.Laws 1010, 1011 (emphasis added). I conclude from the title that the General Assembly prior to passage of Senate Bill 120 intended to limit any right to mental health services pursuant to the Care and Treatment Act to available appropriations. Finally, restrictions placed by the General Assembly on disbursements made in payment of liabilities incurred on behalf of the state indicate that monetary relief for implementation of section 27–10–116 could not be ordered in excess of available appropriations. Section 24–30–202(3) provides:

In no event shall the head of any state department, institution, or other agency or the controller, either by himself or through any assistant designated by him, approve any commitment voucher involving expenditure of any sum in excess of the unencumbered balance of the allotment to which the resulting disbursement would be charged. No person shall incur or order or vote for the incurrence of any obligation against the state in excess of or for any expenditure not authorized by appropriation, allotment, and approved commitment voucher except as expressly authorized by this section.

Any such obligation so raised in contravention of this section shall not be binding against the state but shall be null and void ab initio and incapable of ratification by any administrative authority of the state to give effect thereto against the state. But every person incurring or ordering or voting for the incurrence of such obligation and his surety shall be jointly and severally liable therefor.

10 C.R.S. (1982).[1] Under this statute, department officials may not approve an expenditure in excess of the amount appropriated by the General Assembly. To do so could subject them to personal liability for the amount of excess appropriations. The interpretation adopted by the trial court would place these public officials in the untenable position of being compelled to release funds they are statutorily prohibited from releasing. That the General Assembly intended such a result is unthinkable.

## II.

The remaining issues addressed by the majority are not properly before the court because of its disposition of the case for failure to comply with various subsections of C.R.C.P. 23. I would refrain from offering what amounts to an advisory opinion on the issues addressed in Parts II.C, II.D, II.E, and II.F of the majority opinion. This court is not empowered to give advisory opinions based on hypothetical fact situations. *Tippett v. Johnson,* 742 P.2d 314, 315 (Colo.1987); *Kemp v. Empire Sav., Bldg. & Loan Ass'n,* 660 P.2d 899, 901 (Colo.1983); *People v. Campbell,* 196 Colo. 390, 392, 589 P.2d 1360, 1361 (1978); *see also Hall v. Beals,* 396 U.S. 45, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969). As we said recently, statements concerning issues not necessary to the disposition of the case "should be recognized as dictum without precedential effect." *See People in the Interest of Clinton,* 762 P.2d 1381, 1385, (Colo.1988).

1. Section 24–30–202(3) was amended in 1988 by deleting the word "allotment" and inserting the word "appropriation." Ch. 170, § 1, § 24–30–202(3), 1988 Colo.Sess.Laws 908, 912.

The amendment was effective March 18, 1988, and applies to appropriations and expenditures for the 1988–89 fiscal year and thereafter. *See* editor's note to § 24–30–202, 10A C.R.S. (1988).

I therefore concur as to Part II.A and as much of Part II.B.2 that conforms to this special concurrence. I express no opinion as to Parts II.C, II.D, II.E and II.F, and dissent as to Part II.B.1.

I am authorized to say that Justice ERICKSON joins in this concurrence and dissent.